**INDIAN HEAD, INC.**

v.

**UNITED STATES.**

**C.D. 4758, Court No. 76–1–00142.**

United States Customs Court.

Aug. 3, 1978.

Bronz & Farrell, Washington, D. C. (Edward J. Farrell, Washington, D. C., of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C. (Madeline B. Cohen, Washington, D. C., trial attorney), for defendant.

NEWMAN, Judge:

The centerpiece of this litigation revolves around the question of whether certain white wool yarn exported from Canada and entered at the port of New York in April and May 1975 was "colored" within the purview of headnote 2(b), schedule 3, TSUS. And encompassed within the foregoing issue, as a wheel within a wheel, is the question: is white a color?

I have concluded that the yarn was not "colored", as that term is defined in headnote 2(b), and therefore the merchandise was not entitled to duty-free entry pursuant to item 307.60, TSUS.

The regional commissioner of customs classified the yarn under the provision in item 307.64, TSUS, for "Other" yarns of wool, and assessed duty at the rate of 30 cents per pound plus 15 per centum ad valorem. Plaintiff claims that the yarn was entitled to duty-free entry pursuant to the provision in item 307.60, TSUS, for "Yarns of wool, colored, and cut into uniform lengths of not over 3 inches, in immediate packages or containers not over 6

ounces in weight including the weight of the immediate package or container".

## I.

There is no dispute that the imported yarn met all of the requirements of item 307.60, TSUS, except the specification that the yarn be "colored". The term "colored", as applied to textile materials and articles, is defined in headnote 2(b) of schedule 3, TSUS, which reads:

> (b) the term *"colored"*, as used in connection with textile materials or textile articles, means that they have been subjected to a process such as, but not limited to, dyeing, staining, painting, printing, or stenciling, in which color is imparted at any stage of manufacture to all or part of the fiber, yarn, fabric, or other textile article, except identification yarns and except marking in or on selvages;

## II.

At the trial, each party presented the testimony of two witnesses, and various exhibits. Plaintiff's witnesses were: Sidney Wasch, president and chief executive officer of Bucilla, a subsidiary of Indian Head, Inc. at the time of the importations in 1975;[1] and David Hay, president and general manager of Spinrite Yarns & Dyers, Limited, the Canadian manufacturer and exporter of the wool yarn in issue. Defendant's witnesses were: Dr. Eugene M. Allen, Research Professor of Chemistry at Lehigh University, director of the university's color science laboratory, and since 1952 a specialist in color theory; and Arthur Price, Professor of Textile Science and chairman of the Textile Science Department of the Fashion Institute of Technology, a unit of the State University of New York. The official papers were received in evidence as an unmarked exhibit.

The pertinent facts concerning the processing of the imported yarn may be briefly summarized. Mr. Hay testified that the wool utilized by his firm to produce the imported yarn varied in color, "[s]ome is whiter, some is yellower, and so on", and was blended together before processing into yarn (R. 36). Hay further testified that the undesirable yellowness in the wool was removed primarily by bleaching it with peroxide, "in order to make it whiter than in its original color" and "in order to get the best white possible" (R. 38, 66–67, 76); and that after the yarn had gone through the peroxide bleach, it was placed in a conventional skein dyeing machine containing an aqueous solution of water, acetic acid and "Uvitex" (R. 39).

The record further establishes that the Uvitex served as an optical fluorescent brightener to enhance the whiteness of the yarn (R. 87–88, 92–93, 95–96), while the acid functioned solely to give the wool an affinity for the Uvitex (R. 59, 61). Finally, neither the peroxide bleach nor the Uvitex imparted any color to the yarn (R. 69–70, 87, 88, 90, 92, 93, 95–98, 107, 110), and in the textile trade "white" is generally not considered as a color (R. 104).

## III.

In support of its claim that the imported yarn met the definition of "colored" in headnote 2(b), plaintiff stresses that the yarn was subjected to a process which changed the natural color of the wool to white, citing *Victor England Agencies, Inc. v. United States,* 50 Cust.Ct. 83, C.D. 2394 (1963). Defendant concedes that the yarn was subjected to a process, but nevertheless insists that the merchandise failed to meet the definition of "colored" in headnote 2(b), in that neither the peroxide bleach nor Uvitex imparted a color to the yarn. Further, defendant urges that white is not a color.

## IV.

▪ I agree with defendant that plaintiff has failed to sustain its burden under headnote 2(b) of establishing that the yarn was "subjected to a process * * * in which

---

1. Bucilla, formerly named the Bernard Ulmann Company, was a wholly owned subsidiary of the plaintiff corporation at the time of the importations (R. 21, 23, 27). However, at the time of the trial, neither Bucilla nor Mr. Wasch was affiliated with the plaintiff (R. 24).

color is imparted" to the yarn. The testimony of plaintiff's witness Hay clearly shows that color was *removed* from, rather than *imparted* to, the yarn.[2] Thus, with respect to the bleaching process, Hay testified (R. 67–70):

Q. So you have gone from Plaintiff's Exhibit 4–B to 4–C. You have bleached it in order to *remove the yellowing,* the natural yellowing matter, is that correct?—A. We have bleached it in order to try and *remove* as much as possible the yellow, yellowness of the wool. [Emphasis added.]

Q. Is that a permanent removal?—A. Nothing is permanent.

Q. Is it the most permanent method that you can use?—A. It is the most permanent I know of.

\* \* \* \* \* \*

Q. Going back to Plaintiff's Exhibit 4–C, which has been bleached, did this bleaching process impart a color to the wool?—A. It *only is an oxidation or bleaching process, and it doesn't impart. All it does is make it whiter, but it doesn't impart. We don't apply any color or apply anything.* All we use is hydrogen peroxide and metabisulfite in order to make it an alkaline bath. We bleach it in an alkaline bath. [Emphasis added.]

Moreover, Hay explained that it was the bleaching process that gave the yarn its permanent white color (R. 71):

Q. At the end of bleaching have the goods been given as permanent a white color as you can give them as far as permanency is concerned?—A. They have been given as permanent a white color on wool as we can give it.

Q. After bleaching?—A. Now, which one are you referring to?

Q. Exhibit 4–C?—A. We have given it the whiteness and the most permanent that we know how to give it.

As to whether Uvitex imparted color to the yarn, Mr. Hay admitted on cross-examination (R. 76–77):

Q. Could you say that if you put Uvitex on Plaintiff's Exhibit 4–B before it is bleached that it would be imparting a color to B?—A. I can't answer that question. I am sorry. I don't know.

Q. Can you say whether your Uvitex imparts a color when you put Uvitex on Plaintiff's Exhibit 4–C—that it imparts a color on Plaintiff's Exhibit 4–D?—A. It makes the product much whiter.

Q. *Does it impart a color?*—A. *I can't answer that.* \* \* \* [Emphasis added.]

Defendant's witnesses testified unequivocably and without contradiction or rebuttal that the peroxide bleach and Uvitex removed, rather than imparted color, to the yarn (R. 87, 88, 90, 92, 93, 95–98, 107, 110). These witnesses explained that a fluorescent brightener, such as Uvitex, is a colorless compound; that by removing color a fluorescent brightener neutralizes the natural yellowness of the wool; and in that respect a brightener is analogous to a bleach (R. 87–88, 92–93, 105).

Further, in distinguishing between the removal and imparting of color, defendant's witness Professor Allen made the following distinction between dyeing and bleaching (R. 96–97):

Q. Is bleaching an entirely different process than dyeing?—A. Well, it depends on how you define that difference. I would say, in general, yes, because in dyeing, you are adding a substance which absorbs light whereas, in bleaching, you are removing material that absorbs light. So that in that sense it is precisely the opposite.

While stating that an optical brightener is often referred to as "white dye", Professor Allen opined that such characterization was confusing, "because I believe that the function of the brightener is not to add color, but to remove it" (R. 97). Defendant's witness Price, however, testified that the treatment of yarn by bleaching it and subjecting it to an optical brightener constituted dyeing, "but not a dyeing that imparts color" (R. 107).

---

2. Plaintiff's witness Wasch gave no testimony concerning the processing of the yarn.

Plaintiff contends that the yarn in issue was colored, since under headnote 2(b) "processing" of the yarn is determinative. In this connection, plaintiff emphasizes the portion of headnote 2(b) which states that an article shall be considered "colored" if it has been "subjected to a *process* * * *" (brief p. 8). In support of its construction of headnote 2(b), plaintiff relies heavily upon *Victor England Agencies, Inc., supra.* There, the issue was whether hanging paper, possessing only its inherent or natural color, was "colored" within the meaning of that term in paragraph 1409 of the Tariff Act of 1930, as modified. Applying the doctrine of *noscitur a sociis*, the court concluded that the term "colored", when used in the statute in conjunction with such words as printed, dyed, lithographed, stained, or bleached, referred to *applied* colors rather than to articles possessing only their natural or inherent color.

Similarly, the definition of "colored" in headnote 2(b), schedule 3, TSUS, expressly requires that the textile article be "subjected to a process * * * in which color is imparted". It should be noted that the phrase "subjected to a process * * * in which color is imparted" is associated with the exemplar processes dyeing, staining, painting, printing and stenciling, each of which involves the *application or addition of pigment or other colorant.* Plainly, then in headnote 2(b) Congress did not contemplate by use of the term "imparted" a color change brought about by the *removal* of color, as occurred in the present merchandise. In sum, headnote 2(b) clearly requires that the textile article be subjected to a process; but plaintiff overlooks that portion of the definition which requires that the process shall *impart* color. Here, as in *Victor England Agencies, Inc.,* no color or pigment was imparted in the processing of the merchandise, and consequently the yarn was not "colored".

Plaintiff claims that whiteness was imparted to the instant yarn by the same process used by the manufacturer to impart colors to other yarns on plaintiff's color chart (exhibit 2), and hence white yarn should be regarded as "colored" under headnote 2(b). However, the record shows that the fluorescent brightener Uvitex functions differently than the dyes used in colored yarns (R. 106–107). The function of a fluorescent brightener is to absorb energy in the ultraviolet or invisible region of the spectrum, whereas the dyes in colored yarns function primarily by absorbing visible light (R. 88–90, 94–95, 100–101, 106).[3]

In *De Ronde v. United States,* 1 Ct.Cust. Appls. 104, T.D. 31112 (1910), the issue was whether bleacher's blue used exclusively for bleaching purposes was dutiable as a "color" under paragraph 45 of the Tariff Act of 1897, or as an unenumerated manufactured article under paragraph 6 of that act. In concluding that the bleaching agent was not a "color" within the purview of paragraph 45, the Court of Customs Appeals observed: "The purpose of its use is not to give color to the product, but to make it white" (1 Ct.Cust.Appls. at 105). Similarly here, the record is clear that the purpose of the processing with bleach and Uvitex was not to impart color to the yarn, but rather to make it white.

Plaintiff posits that the Congressional intent in item 307.60, TSUS, is the same as it was in a former provision, paragraph 1822 of the Tariff Act of 1930—to permit duty-free importation of dyed wool yarn specially designed for making hand-hooked rugs. 103 Cong.Rec. 16768 (1957). Thus, plaintiff's witness Wasch testified that the 47 samples of wool yarn shown on plaintiff's color chart (exhibit 2), including white yarn, were used for making hooked rugs as well as other articles (R. 18).

Fundamentally, of course, the primary source for determining Congressional intent is the language of the statute itself. *United States v. Esso Standard Oil Co.,* 42 CCPA 144, 151, C.A.D. 587 (1955). Item 307.60, TSUS, specifies, *inter alia,* that the

---

**3.** The court can take judicial notice of the fact that fluorescent brighteners are commonly incorporated into detergents for washing fabrics to enhance the apparent cleansing action of the detergent, and not to impart color to the fabrics.

yarn be "colored". To classify the instant white yarn under item 307.60 because it was used for making hooked rugs, as urged by plaintiff, would require this court to ignore the term "colored" in item 307.60. This chimerical interpretation and application of the provision would obviously violate the cardinal rule of statutory construction that, if possible, significance should be given to every word of the provision. *Superior Industries Corp. v. United States,* 62 Cust.Ct. 611, 613–14, C.D. 3833 (1969).

In *Superior Industries Corp.,* the court held that blue or gold billiard cloth was not classifiable as green billiard cloth notwithstanding that the blue or gold cloth was used for the identical purposes as the green cloth, viz., pool or billiard tables.

■ The clear statutory language of item 307.60, TSUS, manifests a Congressional intent to grant duty-free status to wool yarn meeting certain specifications, among which is the specification that the yarn be "colored". Inasmuch as I have found that the instant white yarn was not "colored", as defined in headnote 2(b), it does not fall within the purview of item 307.60, TSUS, irrespective of its use for making hooked rugs.

Plaintiff also asserts that the change in terminology from "dyed" in paragraph 1822 of the Tariff Act of 1930 to "colored" in item 307.60, TSUS, has "no particular significance" and "no change in coverage was intended" (brief, p. 9). The *Tariff Classification Study* (Nov. 1960), schedule 3, p. 5 indicates that terms such as "colored", "dyed", "printed", and "stained" were used indiscriminately in former tariff act provisions, and that the term "colored", as defined in headnote 2(b), includes such terms. Doubtlessly, then the term "colored" in item 307.60, TSUS, embraces the former term "dyed" in paragraph 1822, but as previously pointed out herein, headnote

2(b) also explicitly *requires that color must be imparted* by the particular process applied to the textile article. Inasmuch as the manufacturer's processing did not impart color to the yarn, plaintiff's merchandise fails to meet the definition of "colored" in headnote 2(b), and consequently the yarn is not classifiable under item 307.60.[4]

■ Turning to the question of whether white is a color, "it is to be kept in mind that in a tariff statute Congress ordinarily employs terms in their commercial sense".[5] *Esco Manufacturing Co., aka J. Hofert Co. v. United States,* 63 CCPA 71, 73, C.A.D. 1167, 530 F.2d 949 (1976). In *Atlantic Aluminum & Metal Distributors, Inc. v. United States,* 47 CCPA 88, 91, C.A.D. 735 (1960), the Court of Customs and Patent Appeals held that the testimony introduced by the Government established that the terms "rods" and "bars" did not have a common meaning in the aluminum industry which included tubes. In this connection, the Court observed (47 CCPA at 91):

> * * * The witness called by the Government was an employee of the Reynolds Metal Company, a large producer of aluminum products. This witness was well informed, and he testified that the articles represented by exhibits 1 through 9 would not be recognized as rods or bars, but as tubing. *He also testified that the aluminum trade does not designate such articles as hollow bars or rods. This testimony is unequivocal and clearly supports the Government's position.* [Emphasis added.]

Similarly here, we have the unequivocal (and unrebutted) testimony of Professor Price, an expert in textile science and a consultant to the textile trade and fashion industry, that the general custom in the textile trade is to consider white as a "noncolor" (R. 104). Moreover, both Professors

---

4. Thus, even if, as contended by plaintiff, Uvitex is classified for tariff purposes as a dye and the manufacturer's processing constitutes dyeing (brief, p. 9), the bleach and Uvitex did not impart color to the yarn, and therefore the yarn was not "colored" within the purview of headnote 2(b).

5. Although the term "colored", as used in item 307.60, TSUS, is defined in headnote 2(b), schedule 3, the term "color" as used in the headnote is not further defined.

Allen and Price testified emphatically that white is not a color, but rather the absence of color (R. 90, 91, 99, 110). Both of defendant's witnesses were singularly qualified to speak on the subject of whether white is a color in relation to textiles, and their testimony is entitled to considerable weight, especially since plaintiff adduced no contradictory or rebuttal evidence.

Further, an eminent lexicographic authority confirms the testimony of defendant's witnesses that white is not a "color". Thus, *The New Columbia Encyclopedia* (4th ed. 1975) states (at p. 602):

> color, * * *. The colors of the visible spectrum, called the elementary colors, are red, orange, yellow, green, blue, indigo, and violet; red light, having the longest wavelength, travels more rapidly through the glass than blue light, which has a shorter wavelength. Color is therefore a property of light that depends on wavelength. When light falls on an object, some of it is absorbed and some is reflected. The apparent color of an object depends on the wavelength of the light that it reflects; e. g., a red object observed in daylight appears red because it reflects only the waves producing red light. The color of a transparent object is determined by the wavelength of the light transmitted by it. An opaque object that reflects all wavelengths appears white; one that absorbs all wavelengths appears black. *Black and white are not generally considered true colors * * *.* [Emphasis added.]

In *Victor England Agencies, Inc., supra,* at 86, the court stated that "white" is connotative of an absence of color, and the dictionaries so define it.

In view of the overwhelming evidence of record and lexicographic authority, I conclude that white is not a "color" within the meaning of that term as used in headnote 2(b), and for this additional reason I find that the bleach and Uvitex did not impart color to the yarn. In essence, since the imported white yarn was not "subjected to a process * * * in which color is imparted" within the purview of headnote 2(b), it was not entitled to duty-free status pursuant to item 307.60, TSUS. This action, therefore, is dismissed.

Judgment will be entered accordingly.

